James PLEDGER, Director
Department of Finance and Administration,
State of Arkansas *v.*
GETTY OIL EXPLORATION COMPANY

91-228                                          831 S.W.2d 121

Supreme Court of Arkansas
Opinion delivered May 4, 1992

*Rick L. Pruett*, for appellant.

*David J. Dziak* of Texaco, Inc.'s Tax Department; and *Jack, Lyon & Jones, P.A.*, by: *Eugene G. Sayre*, for appellee.

ROBERT H. DUDLEY, Justice. The single issue in this case is whether the accrued interest income of the appellee corporate taxpayer, Getty Oil Exploration Company, constituted apportionable business income in 1983 and 1984 under the Uniform Division of Income for Tax Purposes Act. The chancellor determined that the income was not taxable by the State of Arkansas. We affirm the chancellor's ruling.

Getty Oil Company, the taxpayer's parent corporation, was a publicly traded major integrated oil company which was incorporated in Delaware but had its headquarters and commercial domicile in Los Angeles, California. In 1979, in anticipation of a subsequent merger, Getty Oil Company formed a wholly owned domestic subsidiary, Getty Reserve Oil, Inc., which also was headquartered in Los Angeles. This subsidiary was authorized to do business in eighteen states, including Arkansas. At the same time, Reserve Oil and Gas Company was a major integrated oil and gas producer and marketer and was a parent company of numerous wholly owned subsidiaries, including Reserve Oil, Inc.

On January 23, 1980, Getty Oil Company acquired the Reserve Oil and Gas Company by corporate merger. The merger included the assets of the wholly owned subsidiary, Reserve Oil, Inc. The assets of Reserve Oil, Inc. were transferred, as planned, to Getty Reserve Oil, Inc. None of the assets of Reserve Oil, Inc. were shown to be in Arkansas. Reserve Oil, Inc. was subsequently dissolved and is no longer material to this case. Getty Reserve Oil, Inc. soon transferred the assets it received from Reserve Oil, Inc. to its parent, Getty Oil Company for a consideration of $159,750,000.00. Getty Oil Company paid this amount with a promissory note dated August 1, 1980, payable to Getty Reserve Oil, Inc. and bearing interest at the rate of six (6) per cent. (It is the interest on this note that will accrue in 1983 and 1984 which the Department of Finance and Administration will attempt to tax.) Getty Oil Company never made a cash payment on the note and for the first sixteen months, made no entries reflecting interest owing on the note. Likewise, Getty Reserve Oil, Inc. made no entries showing interest accruing on the note. Next, on December 31, 1982, immediately before the tax years at issue began, the books of Getty Reserve Oil, Inc. reflected an accrual of $24,247,189.42 interest income on the note and the records of Getty Oil Company reflected the same as an accrued interest expense.

After the note had been executed and delivered, Getty Reserve Oil, Inc. conducted an active oil and gas exploration business in eighteen states and, as a part of that business, acquired and managed gas producing properties in Arkansas.

In early 1983, Getty Oil Company negotiated the sale of Getty Reserve Oil, Inc.'s corporate stock to an unrelated company, Comajo Petroleum Company. However, Getty Oil Company wanted to keep the Arkansas gas producing properties and negotiated retention of those assets.

Meanwhile, from August 10, 1972, until December 28, 1982, Getty Oil Company owned an inactive subsidiary named Getty Oil International (Spain) S.A. On December 28, 1982, the name of this subsidiary was changed to Getty Oil Exploration Company. On February 11, 1983, Getty Oil Exploration Company became qualified to do business in Arkansas under the name of Getty Arkoma, Inc., and immediately afterwards, the promis-

sory note and the title to the Arkansas gas producing properties were transferred from Getty Reserve Oil, Inc. to Getty Oil Exploration Company. (The State contends that the income tax liability began to accrue at this time to Getty Oil Exploration Company.) Getty Oil Exploration Company had no employees of its own; it contracted with Getty Oil Company for the active management of the Arkansas gas fields. It did not hold the note; it was held in Getty Oil Company's office. Getty Oil Exploration Company did not control the note; it was controlled by Getty Oil Company's corporate treasury department. Getty Oil Exploration Company gave nothing for the note which was later cancelled under generally accepted accounting principles.

On December 31, 1983, Getty Oil Company issued a new promissory note to Getty Oil Exploration Company in the amount of $204,793,434.14 bearing interest at the rate of eleven (11) per cent. This new note represented a consolidation of all indebtedness between the parent and the subsidiary. Getty Oil Exploration Company's books, which were kept by the corporate treasury department of Getty Oil Company, reflected an intercompany interest income of $23,211,877.00 as of December 31, 1984. This interest was classified on the corporate books as non-operating revenue. On December 31, 1984, the trial balance of Getty Oil Exploration Company books showed accrued intercompany interest receivable of $11,979,097.00 and long-term intercompany notes receivable of $216,026,213.00.

On February 17, 1984, Texaco, Inc. acquired all of the stock of Getty Oil Company and all of its subsidiaries. As part of the plan of reorganization of the merged companies, Texaco, Inc. made Getty Oil Company a wholly owned subsidiary. Texaco, Inc. owned another subsidiary, Texaco Producing, Inc., and it caused Texaco Producing, Inc. to acquire all of the stock of Getty Oil Exploration Company. By the end of 1984, Getty Oil Company had transferred most of its assets and liabilities, including the liability on the note at issue, to Texaco Producing, Inc. in exchange for stock in Texaco Producing, Inc. In 1985, Texaco, Inc. caused Getty Oil Exploration Company to transfer all of its assets, including the promissory note and title to the gas properties in Arkansas, to Texaco Producing, Inc. as a dividend in kind. Thus, Texaco Producing, Inc. held both the liability of the note payable and asset of the note receivable. The asset and the

liability were then canceled by offsetting accounting entries on the books of Texaco Producing, Inc. Under generally accepted accounting principles, when an obligation and an asset are in the same company, it is the accepted practice to cancel the note.

In Arkansas, Getty Oil Company filed a separate income tax return in 1983 and filed an apportioned income tax return in 1984. It did not attempt to deduct the interest accruing to Getty Oil Exploration Company on either of these returns. Getty Oil Exploration Company, the taxpayer, filed an apportioned tax return in both 1983 and 1984, and reported the accrued interest income, but designated it as "nonbusiness income." Therefore, it did not pay income tax to the State of Arkansas on the accrued interest income.

Through auditors, the Director of the Department of Finance and Administration conducted an audit of Getty Oil Exploration Company's 1983 and 1984 income tax returns and reclassified the accrued interest as "business income." This reclassification caused Getty Oil Exploration's gross income to be increased in 1983 from $1,838,208.00 to $22,638,083.00 and in 1984 from $1,063,283.00 to $21,372,622.00, and caused a deficiency assessment of $389,433.00. Getty Oil Exploration Company protested the deficiency assessment, but it was affirmed by the Administrative Law Judge of the Revenue Department's Board of Hearings and Appeals. The Commissioner of Revenues denied a request for a revision. In 1987, an assessment of corporate income tax and interest was made against Getty Oil Exploration Company in the amount of $512,065.18. This amount was paid by Texaco, Inc., under protest, and this suit for refund was filed in the Chancery Court of Pulaski County. The chancellor found that the accrued interest was "nonbusiness income" and entered a judgment in favor of the taxpayer for the amount paid under protest.

The Director of Finance and Administration's single point of appeal is that the accrued interest was "business income" and therefore taxable. The argument is without merit.

Arkansas is one of twenty-three states that have adopted UDITPA, the Uniform Division of Income for Tax Purposes Act, Ark. Code Ann. §§ 26-51-701 to -723 (1987, Supp. 1989). This Act governs the manner in which Arkansas may impose income

and franchise taxes on the earnings of multistate and multinational corporations doing business in the State. UDITPA is designed to fairly apportion among the states in which a corporation does business the fair amount of regular business income earned by the corporation's activities in each state. Under UDITPA, net taxable business income of a corporate taxpayer involved in a multistate business is apportioned by a well recognized three-factor formula consisting of tangible property, payroll, and sales. Ark. Code Ann. §§ 26-51-710 to -717 (1987).

■ "Business income" is defined in Ark. Code Ann. § 26-51-701(a) (1987, Supp. 1989) as:

[I]ncome arising from transactions and activity *in the regular course* of the taxpayer's trade or business *and includes income* from tangible and intangible property *if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade* or business operations. [Emphasis added.]

■ "Nonbusiness income" is defined in Ark. Code Ann. § 26-51-701(e) (1987, Supp. 1989) as "all income other than business income."

■ To the extent that it constitutes "nonbusiness income," interest income is allocated to the state of the taxpayer's commercial domicile. Ark. Code Ann. §§ 26-51-704 and -707 (1987). In this case the taxpayer, Getty Oil Exploration Company, paid the tax on the accrued interest in California, the state of its commercial domicile.

■ The focus of the statute defining "business income" is the nature of the taxpayer's business. Under the statute business income arises from either of two sources: (1) transactions and activity in the *regular course of the taxpayer's business*, referred to as the transactional test, or (2) income from the acquisition, management, and disposition of property that constitutes *integral parts of the taxpayer's regular business*, referred to as the functional test. *See* McGowan and Murray, *The Business v. Nonbusiness Income Controversy: Recent Developments*, 8 Journal of State Taxation 303, 303-304 (1989).

■ Under the transactional test, the transfer of the note from Getty Reserve Oil, Inc. to the taxpayer, Getty Oil Explora-

tion Company, was an extraordinary and non-recurring event. It was not a transaction in the "regular course of the taxpayer's business." The evidence clearly shows that the taxpayer gave no consideration for the multi-million dollar intercompany note, and the parent corporation simply used the subsidiary taxpayer to hold the note. It was a unique, non-recurring event. This is the only promissory note that the appellee taxpayer, Getty Oil Exploration Company, is shown to have held. It was not shown to have accrued any other interest. The chancellor correctly held this was a non-recurring event and was not a transaction that occurred in the *regular course* of the taxpayer's business.

■ The proof is equally clear under the functional test. The appellee taxpayer, Getty Oil Exploration Company, was not in the business of acquiring, managing, or disposing of this type of property. Before 1983, it existed only as an inactive corporate shell named Getty Oil International (Spain) S.A. The shell did not acquire, manage, or dispose of notes or invest in other intangible assets. The related company that originally held the note, Getty Reserve Oil, Inc., was sold to an unrelated company. The parent company changed the name of this corporate shell to Getty Oil Exploration Company at the end of 1982 and in January 1983, transferred the note and the gas producing property in Arkansas into it. The appellee taxpayer is not the successor of the original holder, Getty Reserve Oil, Inc., which ceased to exist within the taxpayer's corporate family. The appellee taxpayer was a subsidiary corporate entity into which the parent placed the intercompany note for bookkeeping purposes; it gave no consideration for the note. It was a passive holder of a note that was generated as a result of an intercompany transaction to which it was not a party. It did not have a plan of active corporate investment in order to expand the corporation. It did not manage the note; it had no employees. It did not hold the note; it was held at the parent company's office. It did not control the note; it was controlled by the parent corporation. It did not have any active investment strategies in intangibles such as stocks, bonds, or promissory notes. Thus, the acquisition, management, and disposition of notes was not an integral part of the taxpayer's regular trade or business. The taxpayer proved that the intangible income was earned in the course of activities unrelated to its regular business operations within the State.

■  The Director argues that one of the principal purposes for the taxpayer's existence was to manage the note. He argues that the taxpayer's income from gas operations amounted to only $1,838,200.00 in 1983 and $1,063,283.00 in 1984, while the intercompany interest income amounted to $20,799,875.00 in 1983 and $20,309,339.00 in 1984. Based on these figures he argues that the taxpayer's main purpose was to manage the note. For the reasons set out in the preceding paragraphs, it is clear that the taxpayer's regular business purpose was not to manage notes. In addition, the "purpose" test has been discredited by the Supreme Court of the United States. In *ASARCO, Inc.* v. *Idaho State Tax Comm'n*, 458 U.S. 307 (1982), the State argued that, under UDITPA, it should be able to tax its apportionable share of the intangible income of a corporation doing business in the State but domiciled elsewhere if the intangible property is acquired, managed, or disposed of for purposes relating or contributing to the taxpayer's business. Rejecting the State's "purpose" test, the Court observed that this concept would be no limitation at all on the State's ability to tax the income of a corporation not domiciled within it and said:

> The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently, all of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business."

*Id.* at 326.

Similarly, in the present case, such a "purpose" interpretation of UDITPA's definition of business income would eliminate the distinction between business and nonbusiness income. Thus, the chancellor made no error in her application of the law.

We are not aware of any case to the contrary. The Director cites us to the case of *Bendix Corp.* v. *Director, Div. of Taxation*, 125 N.J. 20, 592 A.2d 536 (1991), but that case is clearly distinguishable. It does not involve the interpretation of UDITPA, but rather involves constitutional issues under the Commerce and Due Process Clauses. It does not involve an isolated note that was generated and passively held as the result of an intercompany transaction, but rather involves investments

which were an integral part of the taxpayer's plan of expansion of the existing corporate business by merger and acquisitions.

The appellee taxpayer makes an alternative argument for sustaining the ruling of the chancellor. It argues that the income from the notes did not have a rational relationship with the State of Arkansas, and a tax on this income would be violative of the Due Process Clause for the State of Arkansas to tax the income from the notes. *See Exxon Corp.* v. *Wisconsin Dept. of Revenue*, 447 U.S. 207 (1980). We do not reach the argument since we affirm the chancellor under the language of the statute.

Affirmed.